

**DAVID MARTIN PRICE** as,
President of **I.F.F.O.C.**
(Independent Federal Fund Oversight Committee)
3121 SE Fremont St.
Topeka, Kansas 66605
(785) 267-5132
**iffocpresident@cox.net**

### IN THE UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF NORTHERN ILLINOIS
### EASTERN DIVISION

**UNITED STATES,** ex rel.
**DAVID MARTIN PRICE** as,
President of **I.F.F.O.C.**
(Independent Federal Fund Oversight Committee)
3121 SE Fremont St.
Topeka, Kansas 66605
(785) 267-5132

FILED

JUL 1 3 2006   NF

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

ORIGINAL

            Plaintiff / Intervenor        06CV3783

        v.                                 JUDGE MANNING
                                           MAGISTRATE JUDGE DENLOW

The Honorable **MARK FILIP**

The Honorable **JOEL M. FLAUM**

The Honorable **EUGENE R. WEDOFF**

The Honorable **JAMES B. ZAGEL**

The Honorable **CHARLES P. KOROCAS**

**IRA BODENSTEIN**, as U.S. Trustee

**JOSEPH BALDI**, as U.S. Trustee

**DAVID P. LEIBOWITZ**, as U.S. Trustee

        Defendants,

1

## COMPLAINT FOR SUSPENSION, REMOVAL ,

## OUSTER UNDER QUO WARRANTO,

## AS WELL AS, IMPEACHMENT PROCEEDINGS AGAINST THE FOLLOWING

## INDIVIDUALS; THE HONORABLE MARK FILIP, THE HONORABLE JOEL M.

## FLAUM, THE HONORABLE EUGENE R. WEDOFF, THE HONORABLE JAMES B.

## ZAGEL, THE HONORABLE CHARLES P. KOROCAS,

## IRA BODENSTEIN, AS U.S. TRUSTEE, JOSEPH BALDI, AS U.S. TRUSTEE,

## DAVID P. LEIBOWITZ, AS U.S. TRUSTEE

(Pursuant to Motion as intervention of right  and application for Writ in the nature of Quo Warranto 3:2:1 (in judicial mode);  28 U.S.C. §§ 2072(b), 2403(a);  FRAP Rule 44;  and, FRCP 24(a), (c) *in pari materia*)

**COMES NOW** on this _/3th_ day of July 2006, the United States, ex rel., through Mr. David Martin Price, President of Independent Federal Fund Oversight Committee, (*Plaintiff / Intervenor*) 3121 SE Fremont St., Topeka, Kansas 66605, (785) 267-5132, is filing the Complaint, pursuant to, Pursuant to Motion as intervention of right  and application for Writ in the nature of Quo Warranto 3:2:1 (in judicial mode);  28 U.S.C. §§ 2072(b), 2403(a);  FRAP Rule 44;  and,  FRCP 24(a), (c) *in pari material,* to the above captioned Court for an Order suspending, removing, or impeaching, the Defendants, The Honorable Mark Filip, The Honorable Joel M. Flaum, The Honorable Eugene R. Wedoff, The Honorable James B. Zagel, The Honorable Charles P. Korocas, Ira Bodenstein, as U.S. Trustee, Joseph Baldi, as U.S. Trustee, David P. Leibowitz, as U.S. Trustee, pending a final Hearing and determination on the Petition for Declaratory Judgment, and judgment of Quo Warranto Suspending, removing, ousting, or Impeaching the Defendants, The Honorable Mark Filip, The Honorable Joel M.

Flaum, The Honorable Eugene R. Wedoff, The Honorable James B. Zagel, The Honorable

Charles P. Korocas, Ira Bodenstein, as U.S. Trustee, Joseph Baldi, as U.S. Trustee, David P.

Leibowitz, as U.S. Trustee, from the Office as Judge or U.S. Trustee in the 7th Circuit District

Court of Illinois, and directing that the authority having power of appointment to fill the vacancy

of Judge or Trustee in the 7th Circuit District Court of the District of Illinois Eastern Division ,

upon such suspension, to appoint a proper person temporarily to fill the Office of Judge in the 7th

Circuit District Court of the District of Illinois Eastern Division,  and to carry on their duties,

until such matters shall be determined, or until the successor to the Office of Judge or Trustee in

the 7th Circuit District Court of Illinois, is elected and duly qualified. The complaint is and states

as follows;

Our legal system is based on the principle that an independent, fair and competent judiciary

will interpret and apply the laws that govern us. The role of the judiciary is central to American

concepts of justice and the rule of law. Intrinsic to all sections of this Rule 2 are the precepts that

judges, individually and collectively, must respect and honor the judicial office as a public trust

and strive to enhance and maintain confidence in our legal system. The judge is an arbiter of

facts and law for the resolution of disputes and a highly visible symbol of government under the

rule of law. *Preamble of the Code of Judicial Conduct.*

COMES NOW the United States (hereinafter "Intervenor") *ex relatione*, Mr. David Martin Price,

Citizen of the United States of America to exercise its statutory right to intervene in the instant

appeal, pursuant to 28 U.S.C. 2403(a), to apply for a Writ of *Quo Warranto* in the instant appeal

and all other relief which this Court deems just and proper, and to provide timely Notice to all

interested parties of same, pursuant to Rule 44 of the Federal Rules of Appellate Procedure

("FRAP") *in pari materia* with Federal Rules of Civil Procedure ("FRCP") Rule 24(c) (**United**

**States** not yet a party);  and Article III, Section 2, Clause 1 ("3:2:1") in the Constitution for the United States of America, as lawfully amended (hereinafter "U.S. Constitution").  See 28 U.S.C. 2072(b) and the Act of June 25, 1948, 62 Stat. 869 *et seq.* in full.

### NOTICE OF CHALLENGE TO THE CONSTITUTIONALITY
### OF CERTAIN ACTS OF THE CONGRESS OF THE UNITED STATES

Pursuant to the duties imposed upon it by virtue of FRAP Rule 44, the Office of the Clerk of this Court ("Circuit Clerk") will now please certify to the Office of the United States Attorney General that the constitutionality of certain Acts of Congress affecting the public interest is herein drawn in question.

Likewise, the Circuit Clerk will now please certify Intervenor's intervention for presentation of all evidence admissible in the instant appeal, and for argument(s) on the question of the constitutionality of 28 U.S.C. 2072(b), and of the Act of June 25, 1948, 62 Stat. 869 *et seq.* presently codified at Title 28 of the United States Code ("U.S.C.")

### RESERVATION OF RIGHTS

Subject to all applicable provisions of Law, the United States hereby expressly reserves all rights of a party and shall be subject to all liabilities of a party as to court costs, to the extent necessary for a proper presentation of the facts and laws relating to the question of the constitutionality of said Acts of Congress.

See Article II, Articles of Confederation ("**United States**, in Congress Assembled"); Williams v. United States, 289 U.S. 553 (1933) (**United States** as plaintiff);  United States *ex rel.* Toth v. Quarles, 350 U.S. 11 (1955) (a private Citizen may appear on behalf of the

**United States** *ex rel.*);   3:2:1 ("Controversies to which the **United States** shall be a Party").   Find "U.S. *ex rel.*" etc. on the Internet.

The "United States" and the "United States of America" are not one and the same.   Congress is expressly prohibited from re-defining any terms found in the U.S. Constitution.   See Preamble ("Constitution for the **United States of America**");   Article II, Section 1, Clause 1 ("2:1:1") ("President of the **United States of America**");   Article VII ("Independence of the **United States of America**");   Eisner v. Macomber, 252 U.S. 189 (1920):

> Congress ... cannot by legislation alter the Constitution, from which alone it derives its power to legislate, and within whose limitations alone that power can be lawfully exercised.

The U.S. Department of Justice does not enjoy general power(s) of attorney to represent the **United States of America**.   Compare 28 U.S.C. 547(1), (2) (Duties).   Willful misrepresentation by officers employed by that Department is actionable under the McDade Act, 28 U.S.C. 530B (Ethical standards for attorneys for the Government).

Whenever the **United States** proceeds as party plaintiff, an Article III *constitutional* court, exercising the judicial Power of the United States, is a prerequisite under 3:2:1 ("The judicial Power shall extend ... to Controversies to which the **United States** shall be a Party").   See 28 U.S.C. 1345 (**United States** as plaintiff).

Whenever the **United States** proceeds as a party defendant, the sovereign must grant permission to be sued.   See 28 U.S.C. 1346 (**United States** as defendant).   In this mode, *a legislative* court is permitted.   See Williams v. United States, 289 U.S. 553, 577 (1933):

... [C]ontroversies to which the United States may by statute be made a party defendant, at least as a general rule, lie wholly outside the scope of the judicial power vested by article 3 in the constitutional courts.  See United States v. Texas, 143 U.S. 621, 645-646.

A private Citizen may move a federal court on behalf of the United States *ex relatione*.  United States *ex rel.* Toth v. Quarles, 350 U.S. 11 (1955), as cited above.

The Lanham Act at 60 Stat. 440 confers original jurisdiction on the several **district courts of the United States** ("DCUS").  These courts are Article III *constitutional* courts proceeding in *judicial* mode.  Compare 15 U.S.C. 1121(a) (uncodified).

See also Mookini v. U.S., 303 U.S. 201, 205 (1938) (*term DCUS in its historic and proper sense*);  and Agency Holding Corp. v. Malley-Duff & Associates, 107 S.Ct. 2759, 483 U.S. 143, 151 (1987) (*RICO statutes bring to bear the pressure of private attorneys general on a serious national problem for which public prosecutorial resources are deemed inadequate*).

The **United States District Courts** ("USDC") are *legislative* courts typically proceeding in *legislative* mode.  See American Insurance v. 356 Bales of Cotton, 1 Pet. 511, 7 L.Ed. 242 (1828) (C.J. Marshall's seminal ruling);  and Balzac v. Porto Rico, 258 U.S. 298, 312 (1922) (The USDC is not a true United States court *established under Article III*.)  See 28 U.S.C. §§ 88, 91, 132, 152, 171, 251, 458, 461, 1367.

*Legislative* courts are not required to exercise the Article III guarantees required of *constitutional* courts.  See Keller v. Potomac Electric Power Co., 261 U.S. 428 (1923);  Federal Trade Commission v. Klesner, 274 U.S. 145 (1927);  Swift v. United States, 276 U.S. 311

6

(1928);   *Ex parte* Bakelite Corporation, 279 U.S. 438 (1929);   Federal Radio Commission v. General Electric Co., 281 U.S. 464 (1930); Claiborne-Annapolis Ferry Co. v. United States, 285 U.S. 382 (1932); O'Donoghue v. United States, 289 U.S. 516 (1933);   Glidden Co. v. Zdanok, 370 U.S. 530 (1962);   Northern Pipeline Co. v. Marathon Pipe Line Co., 458 U.S. 50 (1982);   49 Stat. 1921.

All guarantees of the U.S. Constitution were expressly extended into the District of Columbia in 1871, and into all federal Territories in 1873.   See 16 Stat. 419, 426, Sec. 34;   18 Stat. 325, 333, Sec. 1891, respectively.   Compare Downes v. Bidwell, 182 U.S. 244, 380 (1901) (paraphrasing the Harvard Law Review: the Constitution of the United States, as such, does not extend beyond the limits of the States which are united by and under it); and Hooven & Allison v. Evatt, 324 U.S. 652 (1945) (the guaranties [*sic*] of the Constitution extend into the federal zone only as Congress has made those guaranties applicable).

## INCORPORATION OF ATTACHMENTS

Intervenor now formally incorporates Attachments by reference *infra*, as if set forth fully here in this complaint.

## INCORPORATION OF APPELLANT'S COMPLAINT
## OF JUDICIAL MISCONDUCT PURSUANT TOARTICLE II & III
## OF THE CONSTITUTION OF THE UNITED STATES

Pursuant to the provisions mandated by Article II of the Constitution provides that "civil

Officers of the United States" -- and judges are considered to be among these -- can "be removed

from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and

Misdemeanors."

### BRIEF HISTORY OF THE DEFENDANTS

A). Judge Zagel presiding over Petition No: 05-32440 (D. Ill, ND)

1). In the early 1970s, when Zagel was in charge of the Criminal Division in the attorney

general's office.  In 1970 the attorney general's office had only five lawyers at the time, including

Zagel and James R. Thompson, later governor.

B). Zagel and Joel M. Flaum, who today is chief judge of the 7th U.S. Circuit Court of

Appeals, also worked together in the attorney general's office.

1). In the few years after arriving in Chicago from his hometown of Hudson, N.Y., Flaum

prosecuted criminal cases at the state and federal level, argued successfully before the U.S.

Supreme Court three times and took a seat on the federal bench. His second wife, Delilah, is a

partner at Mayer, Brown, Rowe & Maw. Flaum said -- he went into private practice in the

commercial litigation firm then known as Schimberg, Greenberger, Krauss & Jacobs. It only

lasted 15 months. In September 1965, Cook County State's Attorney Dan Ward hired Flaum to

work as an assistant in the criminal appeals division at 26th Street and California Avenue. Flaum

had caught the attention of the lead prosecutor in the case, William J. Martin. He picked the 29-

year-old Flaum, along with James B. Zagel -- now a federal district judge -- to "be the legal

brains of our team," Martin said.

8

2). While an assistant state's attorney, Flaum took a nine-month leave of absence to help launch a police advisory program at Northwestern's law school at the behest of a young professor named James R. Thompson. The program aimed to train advisers to provide legal and ethical advice to police on-site in the city's police stations. A short while later, Illinois Attorney General Bill Scott asked Thompson to help start a criminal division in that office. Thompson brought Flaum along. Tyrone C. Fahner, now the chairman of Mayer, Brown, Rowe & Maw, was also working in the U.S. Attorney's Office then.

C). As this pool of judges appears to have number conflicts of interest, Lynch questions their ability to continue operating the Everett McKinley Dirksen Building, in the fashion it is currently being operated.

1). After graduating from Harvard, Mr. Filip clerked for the Honorable Stephen F. Williams, U.S. Court of Appeals for the D.C. Circuit, and for the Honorable Antonin Scalia, U.S. Supreme Court.

2). Filip worked as an Assistant U.S. Attorney in the Criminal Division of the U.S. Attorney's Office for the Northern District of Illinois for almost five years. At the U.S. Attorney Office, he prosecuted various cases in the federal trial and appellate courts. These cases involved matters such as legislative, judicial, and police corruption; white collar fraud; labor racketeering; and international heroin trafficking. After the U.S. Attorney's Office, Filip joined the Chicago office of Skadden, Arps, Slate, Meagher & Flom, where he was a partner, and where his practice included commercial litigation, corporate internal investigations and criminal defense.

3). In March, 2004, Filip became a United States District Court Judge for the Northern District of Illinois. Mr. Filip has taught at the Law School for the past several years, and

previously taught a seminar in advanced criminal law at the Northwestern University School of Law.

4). Mr. Lynch questions Filip's ability to deliver an unbiased decision.

D). Chief Federal District Court Judge of the US Bankruptcy Court, Northern District of Illinois Eugene R. Wedoff as presiding Judge in Case No: 05-B-32440.

1). The Honorable Eugene R. Wedoff, has stated several times during his proceedings that there was not an order to stay, therefore he had jurisdiction to act, which is not in the uniformity of the application of the law after a notice of appeal has been filed, drawing questions of legality to the 'uniform application of law' in the US Bankruptcy Court of Northern Division of Illinois where (a).the Honorable Eugene R. Wedoff has stated 'for the record', that Mr. Lynch cannot represent himself pro se, and (b) now the Honorable Eugene R. Wedoff has stated 'for the record' he can, (c) the Honorable Eugene R. Wedoff has stated 'for the record' that civil law does not apply in US Bankruptcy Court of Northern Division of Illinois, (d) the Honorable Eugene R. Wedoff had stated 'for the record' that even though he knew the seal had been broken there was nothing he could, or would, do in his jurisdiction.

2). The Honorable Eugene R. Wedoff has admitted to receiving residuals, on the record, from his prior law firm Jenner & Block, which represented Pechiney in the acquisition of McCook assets, which now, not only gives the appearance of conflict of interest, but is a direct conflict of interest.

3). Mr. Lynch questions the competency of Eugene R. Wedoff and seeks a competency evaluation or maybe possible quo warranto action against the judges who have allowed these criminal acts to infest this institute of law and appropriate discipline to the court personnel for

10

their gross misapplication of rules and procedural misconduct within the halls of justice in the Seventh Circuit courts.

E). First Circuit Court Judge Stuart Nudelman Case No(s): 02 CH 09478, 02 C 399, in his individual and official capacity as a Circuit Court Judge, and his agents.

1). A 1972 graduate of the Chicago-Kent College of Law who lives in Wilmette, Judge Nudelman was an assistant public defender for 13 years before becoming an associate judge in 1985. He was appointed to the Cook County Circuit Court in 1987 and elected in 1988.

2). Chicago Judge Stuart Nudelman's uncle, Oscar Nudelman, was a member of the original group of Chicago's Jewish Lawyers.

## STATEMENT OF FACTS

1). Michael Lynch became a successful real estate broker in Chicago, Illinois in 1991.

2). In September, or October of 1997, Michael Lynch and his business partners, initiated actions to purchase McCook Metals, LLC.

3). Approximately November of 1997, Michael Lynch began a business relationship with Seyfarth Shaw.

4). The Defendants have political animus against Michael Lynch because of the May 3, 2000 Commission Decision declaring a concentration to be compatible with the common market and the EEA Agreement (Council Regulation (EEC) No. 4064/89)(Case No. COMP/M.1693 – Alcoa/Reynolds) (notified under document C(2000) 1176 (2002/174/EC) from the Commission of the European Communities. Located at **http://eurpoa.eu.int/eur-lex/lex/LexUriServ/LexUriServ.do**? uri=OJ:L:2002:058:0025:0055:EN:.

.

6). The Defendants know and are angered that even their acts of harassment, threats, and violations of law by these officials they cannot be covered up their crimes due to their own admissions and actions.

7). The Defendants know and are angered that the testimony and evidence provided by themselves in an open court show blatant violations of the Appellants Constitutionally protected Rights through their acts of fraud.

8). In September 1991, Michael Lynch leaves his successful position at CB Richard Ellis to form his own company called Michigan Avenue Partners. He quickly becomes a successful businessman and entrepreneur, acquiring distressed real estate properties and manufacturing companies in the Midwest.

9). In October 1997, Michael Lynch is approached by a board member of Reynolds Metals Company based in Richmond, Virginia about his potential interest in acquiring Reynolds's McCook & Sheet Aluminum manufacturing facility in McCook, Illinois.

10). The Reynolds's "McCook "facility is financially hemorrhaging and has a demoralized workforce with approximately 880 USWA union employees.

11). Michael Lynch enters into a Letter of Intent (LOI) for the purchase of the McCook plant for $110 million dollars.

12). The only other party interested in the purchase of McCook, is the French aluminum company, Pechiney. However, after extensive due diligence Pechiney fails to submit a final offer to purchase McCook.

13). Michael Lynch hires the law firm of Seyfarth Shaw to represent him in the acquisition of the McCook facility in October of 1997. Seyfarth is hired to handle all aspects of the acquisition but more importantly for their expertise in Labor, ERISA, Pension liability, environmental and M&A.

14). Ted Cornell and Gus Palioan, equity partners of Seyfarth Shaw and billing partners for Michael Lynch's account and supervise over twenty attorneys on Michael Lynch's legal account.

15). In December 1997, Michael Lynch enters into an Asset Purchase Agreement (APA) for the purchase of the McCook Plant. Michael Lynch signs a commitment letter with General Electric Commercial Finance (GECC) for the financing of his acquisition of McCook.

16). Michael Lynch instructs Ted Cornell and Gus Palioan of Seyfarth Shaw to form McCook Metals, LLC on behalf of Michael Lynch. Michael Lynch also instructs the other economic interests to his partners, John Kolleng, Jim McCall, Dominick Forte, and Matt Ochalski.

17). Seyfarth Shaw does not disclose that their firm has extensive relationship in Chicago and across the country with General Electric and its subsidiaries. This conflicted represented is never disclosed to Michael Lynch until a week before the closing in June 1998. Seyfarth explains to Michael Lynch that Seyfarth represented General Electric on a minor labor issue in California. Seyfarth does not disclose to Michael Lynch its extensive relationship with General Electric and it's subsidiaries.

18). In March 1998, Jack Kelzer, Vice President of Reynolds Metals Company and the officer in charge of the disposition of the McCook facility, calls Michael Lynch via telephone

and asks him to meet with Reynold's competitor, Alcoa. Mr. Kelzer explains to Michael that ALCOA will not agree to the assignment of the patents and licenses to McCook Metals unless he personally meets with Alcoa in a face-to-face meeting. Michael Lynch receives a phone call from John Wilson, assistant General Counsel of Alcoa to schedule a meeting at Alcoa's plant in Davenport, Iowa a week later.

19). Michael Lynch and his associates meet with Alcoa in Davenport, Iowa with senior officers of Alcoa. In addition to Mr. Wilson, other directors were Pat Hassey and John Collins. The meeting lasts for an hour. Alcoa attempts to intimate Michael from purchasing the facility from Remolds Metals. Threats by Alcoa are made to Michael Lynch and his associates. Michael Lynch leaves the meeting and conveys to Alcoa that if they refuse to assign the patents to McCook Metals as a condition of closing with Reynolds he will sue Alcoa in Federal Court on Anti-Trust grounds.

20). In April 1998, Jim Ogborne the ex-Reynolds plant manager for McCook Plate and Sheet Facility who is selected by Michael Lynch, to become CEO of McCook Metals, is found dead in Grant Park, in downtown Chicago. Michael Lynch requests that Jack Kelzer of Reynolds Metals have Northwestern Hospital perform an autopsy on Mr. Ogborne. Mr. Kelzer complies with Michael Lynch's request. Michael Lynch is forced to replace Mr. Ogborne with Tom Stevens, a former marketing director of Reynolds Metals and now an Executive Vice President with the newly formed McCook Metals, LLC. Mr. Stevens was extremely upset with Michael Lynch and his associates on the appointment of Mr. Ogborne as CEO / President of McCook Metals. Mr. Stevens and Mr. Ogborne were roommates in an apartment in downtown Chicago, and spent weekends with their families in Richmond, Virginia.

14

21). Alcoa, under threat of civil action from Michael Lynch and his partners acquiesces and Michael Lynch closes his acquisition of the McCook Plant from Reynolds Metals on June 18th, 1998. General Electric Commercial Finance (GECC) is the lender to McCook Metals, LLC, the entity formed by Seyfarth Shaw on behalf of the individuals to acquire the plant from Reynolds.

22). McCook Metals manufactures aluminum for the Boeing 717 commercial airliner in Toronto, Canada. 60% off its sales revenues are Department of Defense (DOD) related. McCook supplies aluminum for Lockheed Martin F-16 Fighter Jets in Ft. Worth, Texas. It supplies 100% of the aluminum for the NASA space shuttle in Michoud, Louisiana. It supplies and manufactures the wing skins for Boeing military for the C-17 at its manufacturing facility at the Long Beach, CA. airport. McCook supplies the Boeing Chinook facility in Philadelphia. McCook supplies Boeing Space in Huntington Beach, California for the Delta I and II rockets and the international space station. McCook supplies Boeing in Decatur, Alabama for its aluminum requirements for its Delta III and Delta IV rockets.

23). In July, 1999, one month after the closing of the acquisition of McCook, Alcoa submits a un-solicited bid to McCook Metals via Tom Stevens for a five year contract for McCook to supply all its production capacity to Alcoa. Michael Lynch turns down the offer over the objections of Mr. Stevens.

24). In August1999, Ted Cornell of Seyfarth Shaw calls Michael Lynch via telephone to inform him that due to the purchase price of McCook of $110 million dollars against a balance sheet of Reynolds Metals of $265 million dollars, that the individual owners faced a potential tax liability of $100 million dollars. Mr. Cornell suggests that McCook replace Coppers & Lybrand with his former college roommate, Jim Breen, at KMPG.

25). KMPG is hired based on Ted Cornell's recommendations and the restructuring of the McCook transaction is initiated. Ted Cornell and Seyfarth Shaw formed several new Limited Liability Corporations on behalf on the individuals. Seyfarth Shaw forms on behalf of the individuals, McCook Properties, McCook Equipment, First Avenue Development, Cloverleaf, LLC and Bluestar Funding, LLC.

26). In November 1998, Michael Lynch enters into a Letter of Intent (LOI) with Noranda to purchase its Scottsboro aluminum sheet facility in Scottsboro, Alabama. The Scottsboro facility generates $360 million in gross revenues and employs over 600 people.

27). Ted Cornell and Seyfarth Shaw forms Scottsboro Aluminum and Scottsboro Properties on behalf of Michael Lynch and his partners.

28). Michael Lynch with the legal advice of Ted Cornell and Ed Karlin of Seyfarth Shaw enter into a real estate mortgage on behalf of McCook Properties for approximately $32 million. Proceeds from the mortgage are used to pay off GECC and its participant PPM Finance, Inc on the Term B Loan for $15 million and Term C for $17 million dollars. Six (6) months after the McCook closing, GECC and its participant are left with just the M&E loan Term A and the revolver.

29). Michael Lynch closes the J. P. Morgan Loan on December 31st, 1998.

30). In January 1999, Michael Lynch is informed by his Vice President of Sales George O'Donohue that ALCOA is attempting to enter in to five (5) year supply agreements with Boeing for 100% supply of its aluminum requirements to its Everett, Washington facility. That facility manufactures the 737, 747, 757,767, and the 777 Boeing commercial jetliners for the

airline industry. Boeing informs Mr. O'Donohue that ALCOA is threatening not to supply

Boeing with the hard alloy extrusions for the wing caps for the wing skins on its jets at Everett.

Mr. O'Donohue informs Michael that Paul O'Neil, CEO of ALCOA called Henry Stonecipher,

Vice-Chairman of Boeing and threatens Boeing that if McCook Metals is allowed to supply

Boeing at its Everett, Washington facility that ALCOA will not supply the necessary extrusions

for the wing caps and shut the plant production down.

31). McCook Metals is shut out from supplying Boeing at its Everett facility.

32). Michael Lynch and its senior mangers at McCook decided to expand in Europe to

supply the aerospace market as a way to overcome ALCOA dominance over Boeing for its

supply of aluminum. McCook hires an agent to facilitate its meetings with Airbus, EADS,

Daimler Aerospace, and British Airspace. It quickly secures several new supply agreements with

several European Aerospace manufacturers

33). In February, 1999. Michael Lynch closes the Acquisition of the Scottsboro plant from

Noranda.

34). Michael Lynch enters into a five year raw material supply with Reynolds Metals for its

purchase of P1020 and P0404 aluminum ingots. McCook purchases annually over $200 million

of the raw materials from Reynolds. This supply agreement guarantees McCook a safe and

secure raw material supply away from ALCOA market dominance.

35). In March 1999, Michael Lynch is informed by several McCook officers that ALCOA

is attempting to purchase Reynolds Metals. Michael Lynch, along with senior officers at

McCook, formulate a strategy to purchase Reynolds Metals to safeguard its raw material supply away from ALCOA and/or acquire an aluminum smelter for its on supply.

36). Seyfarth Shaw forms McCook Metals Group, LLC for the purpose of acquiring Reynolds Metals. To safe guard secrecy, Ted Cornell, Seyfarth Shaw calls the project, "Project Titanic". In addition to Seyfarth Shaw, Michael hires investment bankers Bear Stearns and Brown Gibbons & Lang to help assist in raising capital. He also hires Dennis Block, of Caldwalder, Wickstrom in New York to assist in a tender offer, and KPMG to advise on tax issues.

37). In June, 1999, McCook Metals, LLC and Michael Lynch are awarded by General Electric, the 1999 Industrial Customer of the year. Jack Welch, Chairman of GE fly's into Chicago to host a dinner for Michael and his colleagues.

38). In July 1999, Michael Lynch meets with GECC at to discuss suite 2300, 10 South LaSalle Street, Chicago, Illinois to discuss GECC being the lead lender for the potential purchase of Reynolds Metals. John Hopkins and Rachel Hands of GECC/Chicago tell Michael Lynch and his colleagues that they will submit approval to GECC/Stamford for approval.

39). In late April, Dean Vanek, staff counsel for McCook Metals informs Michael Lynch that ALCOA is threatening the Boeing Space/Long Beach manufacturing facility that it cannot continue to receive its wing skins that are manufactured at McCook to be supplied by McCook, because ALCOA would not assign its licenses agreement with McCook Metals for its T7717 patent. Thus disallowing McCook to supply Boeing Military for its C-17 wing skins.

40). In May 1999, Michael Lynch is informed by Bob Hamilton of McCook Metals that ALCOA was threatening to sue Boeing/MDCAN, located in Toronto, Canada, if McCook Metals was allowed to supply Boeing with Aluminum and wing skins for their 717 Commercial Jetliner that was produced in Toronto. ALCOA told that they were not going to renew their license with McCook Metals on its T6151 patent.

41). Michael Lynch and his colleagues hire Steve Thompson of Jenkins & Gilchrist/Chicago to ALCOA on Patent fraud and antitrust violations in the Federal District Courts in Chicago.

42). In late July, 1999, ALCOA submits a tender offer to purchase Reynolds Metals.

43). On August 11, 1999, Michael Lynch submits his alert native offer to ALCOA to buy Reynolds Metals Company.

44). On August 12, 1999, Michael Lynch talks at length with Jerry Sheehan, Chairman of Reynolds Metals on the purchase of Reynolds Metals by Michael Lynch and his group.

45). On August 13, 1999, GECC makes a public statement that it is withdrawing its support for Michael Lynch's offer to purchase Reynolds Metals.

46). On August 15th, 1999, the Reynolds Metals Board of Directors approves the tender offer of ALCOA at $62.00 per share. The board refuses to solicit other offers, effectively blocking out Michael Lynch and other companies that expressed interest in acquiring Reynolds Metals at a higher offer.

47). On August 16th, 1999, Michael Lynch meets with Seyfarth Shaw and McCook senior officers to review its options to block the ALCOA/Reynolds merger.

48). In September 1995, Michael Lynch hires Kevin O'Keefe of the law firm of O'Keefe, Acheson & Lyons to advise Michael Lynch on the strategy to fight the ALCOA/Reynolds merger. Mr. O'Keefe is member of the kitchen cabinet to the Clinton Administration and former aide to Bruce Lindsey, White House General Counsel. Based on Mr. O'Keefe's advice, Michael Lynch hires assembles advisors to assist him in the Reynold's ALCOA merger. He hires the Washington, DC law firm of Patton & Boggs, the public relations firms of Robinson Lehr of New York and Jascula Terman of Chicago.

49). Based on advice of his legal advisors Michael Lynch files a lawsuit in the District of Columbia against ALCOA in the prevention of the merger with Reynolds Metals. Michael Lynch and his colleagues also mount an aggressive legislation campaigns with the Department of Justice in Washington, the Congressional delegations of Pennsylvania, Illinois, Alabama, Oregon and Washington, and the anti-trust authorities of the EU.

50). As an alternative Michael Lynch and his colleagues attempt to purchase Southwire Aluminum, Columbia Falls Aluminum, and smelters from Kaiser Aluminum in attempt to secure its own raw material supply should the U.S. Government not protect McCook and its employees.

51). In September 1999, Howard Pisons, Vice president of GECC in Chicago informs Michael Lynch that his McCook loan is now being administered by Jack Welsh out of Fairfield, CT. instead of Stamford, CT. He also informs that due to his close relationship with Michael Lynch and McCook he has been removed from the account. He tells Michael Lynch that in

addition to Mr. Welch that Rachel Hands and Stuart Feehan of Chicago will be handling the day to day of McCook.

52). Mr. Pisons also informs Michael Lynch and his colleagues that due to their competitive offer for Reynolds, combined with his litigation against Alcoa, GECC relationship with Michael Lynch is over. A month later, Mr. Pisons resigns from GECC and joins a Christian Ministry in Chile with his wife. Michael Lynch on the advise of Mr. Pisons conducts monthly management litigation updates with GECC in their downtown Chicago offices.

53). Michael Lynch and his colleagues meet with the U.S. Department of Justice in Washington, D.C. who conveys to Michael Lynch and his attorneys at Patton & Boggs that they have substantial evidence on ALCOA to prevent the merger.

54). Simultaneously, Michael Lynch and his colleagues testify in Brussels against the proposed merger between Reynolds & ALCOA.

55). In June 2000, the DOJ and the EU render their decision to force ALCOA to divest of several of the Reynolds Metals assets to preserve market integrity. ALCOA is forced to divest 25% Longview Aluminum to preserve an independent source of raw material for McCook and Scottsboro, Michael Lynch and his colleagues are concern that if ALCOA retains controlling interest that McCook and Scottsboro will suffer economically and be forced out of business.

56). Due to the anti-trust litigation in Washington, D.C, mandatory arbitration is required. Michael Lynch and his colleagues are forced to meet with Alain Belda, Chairman of ALCOA and his attorney, Mark Leddy of Cleary Gottlieb.

57). Mr. Belda offers 100% of the Longview, Washington plant under the condition that he stop suing Alcoa on Anti-trust grounds and stop calling ALCOA a monopoly in the media. Michael Lynch who is forced against the wall agrees to the terms and conditions outline by Mr. Belda to preserve McCook Metals and Scottsboro Aluminum.

58). In November 2000, Andy Laidlaw, managing partner of Seyfarth Shaw meets with senior officers of GECC and ALCOA at his country club called Rolling Rock, in Legion , PA. At that meeting and ALCOA conspire to put McCook into Bankruptcy and liquidate its assets. Which shows clear and convincing evidence of malicious premeditation and

59). Pechiney is represented by Jenner & Block/Chicago

60). In December 2000, Michael Lynch enters into an Asset Purchase Agreement (APA) with ALCOA for the purchase of the Longview, Washington Aluminum Smelter. Ted Cornell, Seyfarth Shaw forms Longview Aluminum, LLC on behalf of Michael and his colleagues. Michael Lynch pays $155 million for the smelter. Due to the California energy crisis, Michael Lynch sells energy proceeds to the Bonneville Power Administration (BPA) and splits the proceeds with the BPA. Additionally, to preserve his workforce, Michael Lynch curtails the smelter, and sends his workforce home for two years will full pay and benefits. This cost to Michael Lynch and his colleagues is approximately $40 million dollars.

61). In January 2001, KPMG audits the books & records for McCook Metals and Scottsboro Aluminum. KMPG gives McCook Metals a clean review. In late January 2001, GECC conducts a surprise audit at McCook. Michael Lynch under the advice of Howard Pisons, authorizes McCook Metals auditor, KPMG to now conduct quarterly audits with his finance staff.

22

62). In February 2001, Michael Lynch closes the Longview Aluminum with Alcoa. Michael pays off the $155 million dollars of acquisition debt, fifteen (15) months upon closing the acquisition of Longview with Alcoa. KPMG and Seyfarth Shaw advise Michael on the structuring of the transaction.

63). In March, 2001, Michael Lynch and his colleagues enter in a Letter of Intent (LOI) to develop the excess real estate in an industrial park. Michael Lynch signs Home Depot as its first tenant in the business park. McCook also is planning a new corporate headquarters and R&D center at the industrial park. The development proceeds for the industrial park exceed over $100 million dollars.

64). GECC's transportation arm TIP Transportation makes an un-solicited offer to buy the excess land at McCook. Michael Lynch declines the offer.

65). In May 2001, McCook Metals is awarded the sole source supplier of Aluminum Lithium supply contract to Lockheed Martin for the Joint Strike Fighter (JSF). The contract is the largest military contract in U.S. history and is a huge victory for McCook Metals. Alcoa and Pechiney are not awarded any supply content.

66). In April 2001, GECC audits the books and records of McCook Metals, LLC. GECC certifies a clean audit with McCook Metals, LLC.

67). In early May 2001, McCook Metals is awarded a five year supply agreement with Airbus in Europe to supply up to 50% of the aluminum to the commercial jetliner manufacturing facility in France.

68). Tom Stevens, CEO of McCook Metals secretly meets with Pechiney in Ravenswood, West Virginia with the secret approval of John Kolleng, McCook Metals General counsel and

equity partner. Michael Lynch and the remaining partners are unaware that these secret discussions are taking place.

69). In June 2001, GECC freezes the financing for McCook Metals and sends in a forensic accounting firm called Boston & Associates to complete a "new" audit of McCook Metals. It is learned later that General Electric is an equity owner in the accounting firm of Boston & Associates. Karen Austin of GECC, Stamford, CT. sends a letter to Michael Lynch stating that McCook Metals was in default and with no explanation freezes the credit facility. Michael is forced to make payroll with his own funds for his 600 employees.

70). In July, 2001, Dean Vanek, staff legal counsel for McCook Metals mysteriously resigns to accept a position as General Counsel and Secretary of Meridan Automotive Systems. It is later learned through deposition testimony that Mr. Vanek was placed into that position by attorneys at Seyfarth Shaw. Mr. Vanek receives $5 million dollars in stock and a base salary of $400,000. His compensation at McCook was $110,000.00. Meridan top executives are all ex-Alcoa officers and employees, the company is financed by GECC and its legal counsel is Seyfarth Shaw. Although, the corporate headquarters for Meridan are located in Dearborn, Michigan, Mr. Vanek does not relocate to Michigan. Instead he commutes weekly to Michigan from Chicago. However, despite being General Counsel of a Billion dollar company, he spends only two (2) days a week in Michigan. On July, 16th, 2001, Mr. Vanek with the assistance of John Kolleng review and approval sends an anonymous letter to Michael McKay of GECC claiming Michael is committing fraud at McCook. Deposition testimony and evidence would later prove that Michael did not nor was involve in any fraud at McCook. GECC officers would testify, there was no fraud at McCook.

71). On July 16th, 2001, Clyde Rundle, Director of Human Resources with McCook Metals resigns to join Dravo, Inc. in Pittsburg, Pa.  His new compensation package exceeds well over $1 million dollars. Dravo supplies Alcoa with is Lime Supply for its aluminum smelters worldwide. Seyfarth Shaw represents Dravo and it is later learned former Alcoa executives managed Dravo.

72). In Mid-July, David Poremba, McCooks's CFO resigns and joins Abbott Labs as a controller in Puerto Rico; He leaves his wife and four kids and moves into a million dollar house in Puerto Rico with his "life mate" name Kurt. GECC despite publicly claiming he committed borrowing base fraud provides a letter of recommendation for his new job position.

73). In mid-July 2001, Seyfarth Shaw secretly prepares Bankruptcy papers for McCook Metals, without notification or approval to or by Michael Lynch.

74). On July 31, 2001, Ted Cornell of Seyfarth Shaw and John Kolleng, General Counsel of McCook Metals, without informing Michael Lynch and the rest of the equity owners, secretly meets with officers and legal representatives of Pechiney Jenner & Block. Ted Cornell sends a letter and package regarding McCook Metals to Phillip Darmayan, Vice Chairman of Pechiney. A meeting is scheduled in Chicago for August 10th, 2001.

75). On August 1st, 2001, Michael Lynch along with his attorneys, Ted Cornell and Gus Palioan of Seyfarth Shaw meet with GECC at their offices at 10 South LaSalle, Chicago, Illinois. Michael Lynch is not informed by Seyfarth Shaw that they are conflicted in their representation of Michael Lynch because of their extensive relationship with GECC.

76). At the meeting, GECC accuses Michael Lynch and his colleagues of committing fraud due to the over advance on the borrowing base certificate. Michael Lynch refutes the charges and wants his accounting firm KPMG to do a physical audit of the inventory. GECC refuses to allow KPMG to enter McCook to do a physical audit. Both Ted Cornell and Gus Palioan are silent in

the meeting. Deposition testimony would later prove that GECC officers were told to falsify the forensic accounting firm report about McCook Metals and create an "alleged" fraud. Deposition testimony and evidence documents prove that there was no fraud at McCook. [First pattern of practice of fraud]

77). The meeting concluded with GECC indicating that they would work with Michael and his colleagues and allow Michael Lynch to refinance the McCook credit facility with CIT or Bank of America.

78). After the meeting, PPM Finance, LLC, the co-lender at McCook with GECC, and sole lender at Scottsboro Aluminum files an involuntary bankruptcy against the company. Deposition testimony by PPM officers will later prove that if GECC had not accused Michael of fraud at McCook, PPM would have not filed an involuntary at Scottsboro Aluminum, in Scottsboro, Alabama. Seyfarth Shaw is bankruptcy counsel, but hires Steve Towbin of the law firm of D'Ancona & Flaum due to Seyfarth dual/conflicted representation of PPM Finance and Michael and his colleagues were not aware of this conflict issue. The Scottsboro bankruptcy case is filed in the US Bankruptcy Court in the Northern District of Illinois. Chief Bankruptcy Judge Eugene R. Wedoff oversees the case.

79). The next day August 2nd 2001, GECC files a lawsuit in Federal District Court in Chicago against Michael Lynch and his colleagues. The lawsuit alleges that Michael Lynch and his colleagues committed fraud by allowing an over advance on the borrowing base certificate.

80). On August 3rd, at 9:30 am, without approval or Board Consent by Michael Lynch and/or his colleagues, Ted Cornell arrives in Federal Court along with GECC's attorneys at Latham & Watkins verbally convey to Judge Holderman that McCook Metals and GECC have reached an agreement. Mr. Cornell claims, without consent of Miahel, that GECC has withdrawn

its lawsuit against Michael Lynch and his colleagues on the condition that McCook Metals files a voluntary bankruptcy.

81). On August, 3rd 2001, Gus Palioan, without knowledge and consent of Michael Lynch faxed a conflict waiver to Doug Tabor of GECC in Stamford, Ct., for his review ands signature, of Mr. Tabor before joining GECC in Stamford, Ct. is a former legal colleague of Mr. Palioan in Chicago.

82). Unknown to Michael Lynch and his colleagues, Seyfarth Shaw attorneys work over the weekend on August 4th and August 5th 2001 to prepare the bankruptcy papers for McCook.

83). On Monday August 6th, 2001, Seyfarth Shaw without Michael's approval and a formal McCook Metals Board meeting or Board consent, Seyfarth Shaw files bankruptcy papers in the U. S Bankruptcy court in the Northern District of Illinois. Judge Wedoff also assigns this case to himself. Seyfarth Shaw falsifies their 2014 affidavit. [Second pattern of practice of fraud]

84). On August 7th, 2001, Michael Lynch and his colleagues are forced to sign, under duress of hostile takeover the conflict letter with GECC at Seyfarth Shaw's request. Seyfarth Shaw conveys to Michael Lynch and his colleagues that GECC will liquidate the company if the conflict letter is not signed.

85). On Friday August 10th, 2001 a secret meeting is held in Chicago by Ted Cornell of Seyfarth Shaw and John Kolleng of McCook Metals with Philip Darmaryn of Pechiney and his attorneys at Jenner & Block. It is agreed at that meeting by John Kolleng and Ted Cornell that McCook Metals would be sold to Pechiney through a 363 bankruptcy sale. Additionally, Mr. Kolleng would receive "kickback" compensation, and Mr. Kolleng and Mr. Stevens, (McCook Metals current CEO), would receive key management positions with Pechiney. The meeting, the

financial kickbacks, and management positions were never disclosed to Michael Lynch and/or his colleagues.

86). On the second week of August, Michael Lynch attempts to fire Seyfarth Shaw due to lack of legal advocacy on behalf of Michael Lynch. He attempts to hire Kirkland & Ellis. Mr. Kolleng leaks that information to Ted Cornell. The next day PPM Finance hires Kirkland & Ellis to represent them in the McCook matter effectively conflicting their representation of Michael Lynch.

87). On September 7th, 2001, Michael Lynch is forced to resign by Seyfarth Shaw and GECC. Latter, deposition testimony and material evidence is disclosed that Ted Cornell and Gus Palioan become aware that Michael Lynch was closely working with Bank of America and CIT Finance to pay off GECC its indebtedness. Seyfarth Shaw is alarmed by this and notifies GECC. GECC withholds its funding of McCook Metals until Michael Lynch is forced to resign during the hostile takeover.

88). Two weeks later, GECC rewards Seyfarth Shaw all the legal work for Heller Financial, a $7 billion dollar revenue subsidiary of GECC.

89). In late October 2001, Seyfarth Shaw and GECC terminate the remaining equity partners and officers at McCook without board consent or approval. GECC installs as acting CEO, Gerry Curran to run McCook Metals. Mr. Curran has had similar assignments for GECC.

90). Michael Lynch and his partners file a motion for a U. S. Trustee to prevent Seyfarth Shaw and GECC from taking control over McCook Metals and liquidating the company

91). Gus Palioan recommends to the U. S. Trustee's office, that his neighbor in Park Ridge, Illinois and friend, Joe Baldi to be hired to pursue various claims as the U.S. Trustee for McCook Metals. Seyfarth also provides to Mr. Baldi at twenty (20) page memo outlining a media strategy

to destroy Michael Lynch and his family publicly in the news media and thru various claims filed against his him, his family and his children's school

92). Mr. Baldi is officially named U. S. Trustee for McCook Metals. Mr. Baldi falsifies his 2014 affidavit. [Third pattern of practice of fraud]

93). During the month of November, 2001 Mr. Baldi meets with the Chicago Tribune and America Metals Market (AMM) to slander and defame Michael Lynch. This effort is an attempt to destroy Michael Lynch's reputation and his attempt to save McCook Metals from liquidation.

94). In mid November, Seyfarth Shaw conducts a board meeting for McCook Properties, LLC. Without notifying Michael Lynch and the other members of the Board, Seyfarth conducts the meeting; terminate the Board without oral or written consent, and installs Joe Baldi and Howard Samuels as Board Members. McCook Properties then files bankruptcy papers, causing the default on the $32 million dollar real estate mortgage with J.P. Morgan. J. P. Morgan would later sue Michael Lynch for the default of the mortgage.

95). In November 2001, Michael Lynch and his colleagues submit a Letter of intent (LOI) for the repurchase of McCook Metals as an ongoing concern. The LOI offers $41 million in cash, and $62 million of assumed liabilities to include the JP Morgan Chase Real Estate Mortgage and the PBGC Pension liability for a total consideration of over $100 million dollars. Robert Fishman of Shaw Gussis, Joe Baldi's attorney demands $4 million dollars non-refundable to discuss Michael's offer.

96). In January 2002, GECC sues Michale and Messrs. Kolleng, Ochalski & McCall in Federal Court in Chicago for its acquisition of Longview Aluminum for $226 million in damages. Mr. Baldi does not sue the other equity owner Dominic Forte, Messrs: Kolleng,

Ochaski and McCall would later settle the claim for $75,000.00 each. Baldi continues to maliciously persecute and prosecute Michael Lynch and his family for $226 million dollars.

97). In late February, 2002 an auction is held in Judge Wedoff's Courtroom, for the sale of the McCook Metals assets. Michael Lynch submits his $100 million offer and puts up his $1.5 million dollar earnest deposit to the court. Joe Baldi recommends Pechineys offer of $21 million dollars for a liquidation of the assets and termination of the Pension Plan for the McCook employees over several objections in the courtroom. The pension plan is terminated and a $45 million dollar lien is attached to Scottsboro Aluminum under a so called "control group "liability theory. Unknown at the time, Judge Wedoff was receiving residuals from his former law firm Jenner & Block. Jenner & Block at the time represented Pechiney for the acquisition of the McCook Metals assets and GECC. Judge Wedoff did not recuse himself despite the apparent conflict of interest.

98). In March 2002, Michael Lynch is sued personally in Federal Court by J. P. Morgan Chase for the unpaid Mortgage at McCook. The case is assigned to Judge Gettlemen. Michael Lynch eventually files a third party lawsuit against Seyfarth Shaw for the default of the mortgage at McCook Metals and the personal damages to Michael Lynch.

99). In April 2002, Joe Baldi and Mr. Fishman sue Michael's childrens' school at Lake Forest Country Day in the amount of $60,000.00 for a charitable donation given to the school, by Michael Lynch and Kimberlee Lynch.

100). In April, 2002, Larry Wolfson of Jenner & Block leaves to join Joe Baldi's legal firm Shaw Gussis, as a named partner with Robert Fishman two (2) weeks after the sale of McCook Metals to Pechiney is completed. Jenner & Block represented Pechiney in the purchase of the McCook assets.

30

101). In late April 2002, Alcoa represented by Mark R. Filip of Scadden Arps and his colleagues, negotiate the purchase of the machinery and equipment of McCook Metals from Pechiney. The equipment is relocated to Alcoa's Davenport, Iowa facility, McCook's fierce competitor in aluminum plate and sheet for the aerospace industry.

102). In May 2002, Michael Lynch hires Cummins & Cronin to sue Seyfarth Shaw for breach of Fiduciary Duty, Constructive Fraud, Civil Conspiracy and Legal Malpractice for $226 million in compensatory and punitive damages.

103). In late May 2002, Joe Baldi and Mr. Fishman proceed with the litigation against Michael Lynch for $226 million dollars in purported damages in Federal Court with Eugene R. Wedoff as presiding Judge.

104). In June, 2002, Michael Lynch instructs Steve Towbin along with Robert Cummins not to terminate the Scottsboro Pension plan. Mr. Towbin refuses to take Michael Lynch's instruction and terminated the Pension Plan. Scottsboro is liquidated and all the equipment is sold to Alcoa for relocation to its Texarkana, Texas facility. This Alcoa plant is Scottsboro Aluminum's main competitor in the southern United States.   It is later learned that Mr. Towbin is social friends with Donna Dabney officer and Secretary of Alcoa, and former General Counsel of Reynolds Metals.

105). A month later Steve Towbin, leaves his law firm to join Mr., Fishman and Mr. Wolfson at Shaw Gussis. The law firm now is named Shaw Gussis Fishman Wolfson & Towbin. All three attorneys falsified their 2014 affidavits in the McCook Metals and Scottsboro Aluminum bankruptcies. They failed to disclose to the court their conflicted representation and affiliation with GECC. [Fourth pattern of practice of fraud]

31

106). In July, 2002, it is learned through discovery pertaining to the Seyfarth Shaw litigation, that David Missner of Piper Marbury, the attorney who represented the unsecured creditors in the McCook Metals matter falsified his 2014 affidavit. He failed to disclose his representation of GECC. [Fifth pattern of practice of fraud]

107). In Late 2003, Goldman Sachs through its subsidiary, REP MCR REALTY, LLC purchase the J.P. Morgan claim against Michael Lynch. It is later learned that Goldman Sachs partner in REP MCR Realty, LLC is General Electric.

108). In August 2002, Seyfarth Shaw and Joe Baldi on behalf of the McCook estate with no economic consideration to the estate releases Alcoa of the patent litigation in Federal Court with Judge Lindberg. Additionally, Seyfarth release Alcoa for its environmental liability and PBGC Pension "successor" liability at McCook.

109). Paul O'Neil, former chairman of Alcoa and now U.S. Secretary of Treasury in the Bush Administration is a PBGC Trustee, Mr. O'Neal, negotiates with Seyfarth Shaw to release of Alcoa from the PBGC liability.

110). In 2004, Michael Lynch through his attorneys, Cummins & Cronin sues Alcoa on behalf of Longview Aluminum for the PBGC "successor liability".

111). The PBGC files a $65 million dollars lien against Longview Aluminum. Longview with no debt and $12 million in cash is forced to file bankruptcy protection in Delaware. Mr. Fishman, Joe Baldi's attorney files a motion to remand the case back to bankruptcy court for the US Trustee and is awarded a remand back to Judge Wedoff Courtroom in Chicago. Despite vigorous objections by Michael Lynch and his colleagues, Judge Wedoff removes the case from Delaware to Chicago. A U.S. Trustee, Bill Brandt, John Kolleng's former business partner, is

appointed as U.S. Trustee of Longview Aluminum. Michael Lynch and his colleagues are removed as officers at Longview.

112). In mid 2004, the assets are sold to third parties and Longview Aluminum is liquated, and it's patents sold to foreign purchasers. The PBGC attaches an $82 million dollar lien on Great Lakes Processing, LLC. located in Portage, Indiana under a so called "controlled group" liability theory. The company is profitable and generates $11 million in revenue and employs 98 people.

113). In approximately September 2004, Joe Baldi enters a settlement agreement with John Kolleng for $75,000.The settlement agreement for the Baldi II litigation is two days before the trial. Joe Baldi refuses to offer the same settlement offer that was offered to John Kolleng. Instead, Joe Baldi agrees to settle with Michael Lynch if he pays Mr. Baldi, $10 million dollars and not sue GECC for lender liability. Michael Lynch refuses to agree to those settlement conditions and a two (2) day bench trial is convened and heard by Judge Wedoff. During the trial evidence of crimes committed and disclosed by Seyfarth Shaw, GECC , Shaw Gussis and Joe Baldi. Judge Wedoff refuses to notify the U.S. Attorney's office.

114). In November 2004, the J.P Morgan litigation is re-assigned to a newly appointed Federal Court Judge named Mark R. Filip. Not known at this time that this was the same attorney who while at Scadden Arps negotiated for Alcoa for the purchase of the McCook equipment. Judge Filip does not prepare himself for the case.

115). In late November 2004, Judge Wedoff grants Seyfarth Shaw, to remand of the state court malpractice case to his courtroom. Despite Michael Lynch's objections the remand is granted and a five day bench trial is granted and heard.

116). At the five (5) day Wedoff bench trial, full disclosures are made by Seyfarth Shaw attorneys under oath about their conflicted representation of Michael Lynch and their concerted effort along with GECC to destroy Michael Lynch and sell the assets to Alcoa via Pechiney.

117). In January 2005, Judge Wedoff, rules and enter a judgment for $2.6 million dollars against Michael in the Baldi II litigation. Michael Lynch was sued by Joe Baldi, for $226 million dollars. Baldi does not pursue the other partners.

118). On January 20th & 21st, 2005, a two-day evidentiary hearing is held by Judge Mark R. Filip. Seyfarth Shaw makes false allegations that Michael Lynch and his attorneys created and forged three (3) Xerox copied documents that were turned over by Michael Lynch and his attorneys to Seyfarth as part of the discovery requests, in which Seyfarth Shaw was the custodian of said records.

119). On Thursday January 27th, 2005 Judge Filip enters an oral ruling from the bench that 1) Michael Lynch waived his 7th amendment rights to a jury trial, although this was never the case, and that (2) Michael Lynch, although there was no evidence presented by Seyfarth of the forged documents, Judge Filip entered a judgment and attorneys fees exceeding $32 million dollars. Two weeks later, Judge Filip enters his written opinion and order. It is later learned that Judge Filip did not recuse himself from the case despite his representation of Alcoa in the acquisition of the McCook manufacturing equipment and other matters. Additionally, it is learned that Judge Filip had ex-parte communication with Seyfarth Shaw attorneys.

120). In January 2005, Judge Wedoff enters a judgment against Michael Lynch for $2.6 million dollars in the Baldi II matter. A case that Michael Lynch refuses to settle, due to Mr. Baldi's (US Trustee for McCook Metals) demand that Michael Lynch pay him $10 million dollars and the he not sue GECC for lender liability.

121). In June 2005, Michael Lynch conveys to his attorneys that Seyfarth Shaw and their defense attorneys are influencing judicial verdicts through corrupt means. His attorneys agree with Michael Lynch but state that they cannot do anything about it. Michael Lynch urges his attorneys to file claims against Seyfarth and Miller Shakman & Hamilton. Additionally, given the evidence of the wiretaps on Michael and Kimberlee Lynch's home, Michael Lynch's manufacturing plants and offices that they are obligated to turn this over to the FBI and the US. Attorney's office. They refuse to do so citing that they will be disbarred for taking on the judicial corruption. They abruptly resign.

122). In July 2005, Michael Lynch files his appearance as a Pro Se litigant in Seyfarth Shaw Malpractice case in State Court.

123). In August 2nd, 2005, ten (10) months after the bench trial in 2004, Judge Wedoff issues his Memorandum Opinion. The Memorandum Opinion states there Seyfarth Shaw never represented Michael Lynch in his matters, thus there is no liability. Additionally, he rules that Seyfarth did not represent GECC in any matters. He also states that despite three (3) years of jurisdiction in his Courtroom for the Seyfarth Shaw malpractice case that he now believes that he has no jurisdiction over Michael Lynch's individual malpractice claims, which are a state court matter. Michael Lynch discusses with his attorneys about the judicial corruption in Chicago. His attorneys agree with Michael Lynch, refuse to prosecute the claims and abruptly resign. Michael Lynch is forced to represent himself as a Pro Se Litigant and Defendant.

124). In August 2005, Michael Lynch is forced to file a personal Chapter 11 Bankruptcy filing in Chicago, upon information from Gene Murphy, managing partner of Brain Cave and belief that Seyfarth Shaw, Goldman Sachs (REP MCR Realty) and Joe Baldi were going to force Michael Lynch into an involuntary Chapter 7 filing, the fourth in less than four (4) years.

125). In September, under guise of a discovery request issued by Judge Nudelman, Seyfarth Shaw's attorneys illegally seize all the personal records and computers of Michael in Valparaiso, Indiana. . In those records are Michael Lynch tax records and litigation documents including attorney / client communications between Michael Lynch and his attorney pertaining to litigation involving Seyfarth Shaw, GECC, Alcoa and Pechiney.

126). In October 2005, Michael Lynch files Motions to Purge and Intervene the Seyfarth Shaw malpractice case involving Judge Eugene R. Wedoff's August 2nd, 2005 Memorandum of Opinion.

127). In late October 2005, Michael Lynch files in State Court, a motion of Evidentiary Hearing involving Seyfarth Shaw hiring Ernie Rizzo to install eavesdropping devices at Michael Lynch's home, offices and manufacturing plants.

128). In October, 2005, Michael Lynch files a motion for a rule to show cause against Seyfarth Shaw for illegally seizing his personal records in the state court matter with Judge Nudelman. Showing the pattern of practice of conspiracy.

129). In October 2005, Michael Lynch files a motion to compel Seyfarth Shaw for a turnover of documents, E-Mails and evidence that they have intentionally withheld since the malpractice case was filed in state court in May 2002. Showing the pattern of practice of conspiracy.

130). On October 10th, Judge Wedoff appoints David Leibowitz as the U.S. Trustee in Michael Lynch's Chapter 11 matter. Mr. Leibowitz is hugely conflicted. In his 2014 affidavit, Mr. Leibowitz daughter is an equity partner at Seyfarth Shaw, Seyfarth Shaw represents Mr. Leibowitz in three (3) distinct matters, and more disturbing Shaw Gussis Fishman Glantz Wolfson * & Towbin represent Mr. Leobowitz also in three(3) distinct matters. Michael Lynch

instructs his bankruptcy counsel to oppose the appointment of Mr. Leibowitz due to the flagrant

conflicts. Mr. Golding, Michael Lynch's bankruptcy counsel, claims to Michael Lynch to do so

but the court record show he voiced no opposition.

131). On November 1st, 2005, Michael Lynch presents his motion To Purge [recuse] and to

Intervene in front of Judge Wedoff. The Judge sits and rules in his own motion. The motion is

denied according to Judge Wedoff because he claims it is a motion to recuse when in reality the

papers clearly state its purpose.

132). On January 30th, 2006, Michael Lynch files his Appeal of the Filip Ruling in the

United States Court of Appeals for the Seventh Circuit, Chicago, Illinois.

133). In February and March 2006, Michael Lynch files several motions in Judge Wedoff's

courtroom exposing the crimes committed and obstruction of justice. Despite the conflicted

status of Judge Wedoff, he refuses to recuse himself, notify the U.S. Attorneys office and rules

on his own motions. All motions are denied.

134). On March 21st, 2006, Michael Lynch has no other choice and is forced to file his

motion to dismiss his case, and change of venue.

146). In this matter alone the following violations of existing Illinois state laws have

occurred in the efforts of the Defendants to maintain their federally allocated funding to assure

the daily operations of the Cook County Court and the Everett McKinley Dirksen Building

219 South Dearborn Street, Chicago, Illinois 60604 [location of the Seventh Circuit Court of

Appeals, US District Court, and US Bankruptcy Court for the Northern District of Illinois,

Eastern Division] Chicago, Illinois, and Richard J. Daley Center, 50 West Washington Street,

Chicago, Illinois 60602.

147). The Seventh Circuit Court of Appeals Appeal No: 02 C 399 arose from the erroneous ruling of the Honorable Mark Filip of the U.S. District Court for the District of Northern Illinois, Eastern Division, presiding over Case No: 05-2539. In which the Seventh Circuit Court of Appeals took it upon themselves to violate three (3) seals on 'under seal' pleadings filed by Michael.

148). Kimberlee Lynch, was amended in by Trustee, David P. Leibowitz to extort her shares of any properties and assets co-owned by her, while the proceeds sit in a bank account awaiting the completion of the destruction of the 'Lynch empire' to be disbursed among the attorneys creating this situation on behalf of ALCOA, JP Morgan, and GECC.

149). Kevin Lynch, was amended into a state court matter, created from the Bankruptcy action in violation of the Bankruptcy Rules, as the property Kevin Lynch purchased from Michael Lynch and Kimberlee Lynch was well passed the statutes' provisions for retroactive claims and the Trustee had already seized the monitory aquavits from the purchase of the property.

150). Plaintiff / Relator was invited by Michael Lynch to observe the matters as they unfolded within the 'hall of justice' within the confines of the Dirksen Building and Richard J. Daley Center. Plaintiff / Relator invited an outside auditor to come in and investigate, her findings are hereby attached as **[Attachments 1 & 2]** of ***Price, et al v. Seventh Circuit Court of Appeals, et al* [Doc 1] 06-4055-JAR (D. Kan)**.

151). The Defendants are in direct violation of Racketeering Activity [defined as] (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, <u>extortion</u>, dealing in obscene matter, or dealing in narcotic or other dangerous drugs, which is chargeable under State law and punishable by imprisonment for more than one year; any act which is indictable

under the following [sections] of 18, U.S.C.: 201 (bribery), 224 (sports bribery), 471, 472, and 473 (counterfeiting), 659 (theft from interstate shipment) if act indictable under 659 is felonious, 664 (embezzlement from pension/welfare funds), 891-894 (extortionate credit transactions), 1029 (fraud with access devices), 1084 (transmission of gambling info), 1341 (mail fraud), 1343 (wire fraud), 1344 (financial institution fraud), 1461-1465 (obscene matter), 1503 (obstruction of justice), 1510 (obstruction of criminal investigations), 1511 (obstruction of State or local law enforcement), 1512 (tampering with a witness, victim, or informant), 1513 (retaliating against a witness, victim, or informant), 1951 (interference w/commerce, robbery, or extortion), 1952 (racketeering), 1953 (transport of wagering paraphernalia), 1954 (unlawful welfare payments), 1955 (illegal gambling businesses), 1956 (laundering of monetary instruments), 1957 (monetary transactions derived from specified unlawful activity), 1958 (use of interstate commerce facilities in murder-for-hire), 2251-2252 (sexual exploitation of children), 2312 and 2313 (interstate transport of stolen motor vehicles), 2314 and 2315 (interstate transport of stolen property), 2321 (traffic in motor vehicles or parts), 2341-2346 (traffic in contraband cigarettes), 2421-24 (white slave traffic); any act indictable under 29 U.S.C. 186 (payments/loans to labor orgs) or 501(c) (embezzlement from union funds); fraud connected with a case under title 11, fraud in sale of securities, or felonious dealing in narcotic/other dangerous drugs; or any act indictable under Currency and Foreign Transactions Reporting Act.

152). The Defendants have conspired with each other and its agents, in their racketeering activities causing irrefutable and irreparable harm to the Petitioners.

153). The Defendants have disguised its activities by a 'numbers game' to the general public whereby, concealing their activities from the public eye.

154). The Defendants protect its agents through immunity and protections of the state courts to continue its operations. Making or causing to be made, causing harm to the Plaintiff / Relator, citizens of the state of Illinois, and the United States.

155). The Defendants address any opposition to their industry by and through any means necessary, to include extortion, involuntary bankruptcy, etc, causing harm to the Plaintiff / Relator, citizens of the state of Illinois, and the United States. **[Attachments 3, 4, & 5] of [Doc 1]** *Price, et al v. Seventh Circuit Court of Appeals, et al* **06-4055-JAR (D. Kans)**.

156). The Defendants have forcibly caused financial destruction upon the citizens of Illinois, to continue its operations and subsidize its industry through the 'court system', causing harm to the Plaintiff / Relator, citizens of the state of Illinois, and the United States.

157). The Plaintiff / Relator allege defendants willfully violated 18 USC § 2 which provides:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

158). The Plaintiff / Relator allege that defendants engaged in activities by and through the fore stated action to aid and abet ALCOA, as defendant's agents were rewarded through monetary and political gains causing harm to the Petitioners and the citizens of Illinois.

159). The Plaintiff / Relator allege that defendants willfully promote the involuntary servitude of the citizens of the state of Illinois, and the United States by means of:

a). acts of extortion

b). invasion of privacy

c). involuntary servitude

d). defamation of character

e). intimidation of a witness

f). threats to the safety of life, limb, and property

g). failure to provide equal application of law in court actions.

160). The Plaintiff / Relator allege that defendant Violated 42 USC § 1985(2 & 3)

161). The Defendants have repeatedly harassed the citizens of the state of Illinois, and the United States by and through their attempts to prosecute and persecute Michael, Kimberlee, and Kevin Lynch on the fabrication and creation of documentation and refusal, as the custodian of records, to produce the originals to a court of law.

162). The Defendants have installed listening devises throughout Michael and Kimberlee Lynch's home without proper jurisdiction, or good cause to receive approval from any governing agency to do so.

163). The Defendants have repeatedly interfered with the Lynchs' existing businesses.

164). The Defendants have secured retaliation against witnesses associated with the Lynchs, in retaliation upon the same.

165). The Defendants defamed the Plaintiff / Relator and the Lynchs on numerous occasions, by and through litigation and affiliation within the business community, by and through their direct violations of The Williams Act.

166). The Defendants conspired against the Plaintiff / Relator and the Lynchs in the litigation that created this action, as the Trustee assigned to this matter, David P. Leibowitz, had and has direct conflict of interest.

167). The Defendants and their conspirators appointed Trustee, Ira Bodenstein in his position until such time as Michael was ruled against in the District Court and then rewarded him with an appointment with Shaw Gussis, LLC.

168). The Defendants have concealed and refused to turn over evidence Michael, Kimberlee, and Kevin were entitled to defend themselves, just to conceal the violation of federal laws by state officials in the trafficking of patens and creations of a monopoly in Chicago, Illinois, as an avenue around The Williams Act.

169). The Defendants seek to take property from, punish and otherwise retaliate against the Lynchs and their associates, to include the Plaintiff / Relator, to prevent them from presenting their testimony in federal court.

170). The Defendants seek to further take income and discredit the Plaintiff / Relator and the Lynchs to intimidate them from bringing a federal action exposing their criminal enterprise which willfully and maliciously violates The Williams Act.

171). The Defendants have already committed the act of unlawful seizure to the property of the Lynchs in their hostile takeover of the Scottsboro plant, Great Lakes plant, Longview plant, and now the McCook Metals, LLC., all under the same disguise of bankruptcy all the while ALCOA is assuming possession of the assets as each was and is 'liquidated' pursuant to Chapter 11 Bankruptcies being converted into Chapter 7 actions, with virtually the same participants in each of the actions and in less than 5 years from the Scottsboro matter to date.

172). The Defendants have conspired with the Court appointed Trustee, David P. Leibowitz, to directly, willfully, and maliciously violate 28 USC §586 (a)(3)(F).

173). The Defendants have created a real danger in the income abilities of the Lynchs, to include interference with their personal bank accounts.

42

174). The Defendants have created a harmful atmosphere to Michael and Kimberlee Lynch's family as the matters before the court forcing Michael to seek the U.S. Bankruptcy Court has been handed down by word of mouth to the minor children that attend classes in the school where Michael and Kimberlee Lynch's children attend, creating a hostile environment in their lifelong educational facility.

175). The Defendants have created a hostile work environment for those who would be future clients and / or business partners with the Lynchs, by and through their actions to cover up the crimes they have committed.

176). The Defendants have demonstrated their 'power' in the legal community when the U.S. District Court found Michael Lynch guilty of the fabrication and creation of three (3) documents, with no evidence, as the custodian of record refused to produce the original documents in which they were at all times in custody of, while challenging their authenticity.

177). The Defendants have created a hostile environment between the Petitioners and any future legal representation that they might seek assistance through, as the experiences throughout this matter has caused a definite destruction of trust between the Petitioners and any persons possessing a law degree.

178). The Defendants have placed a strain upon the business relationships of the Petitioners, creating an uncertainty of the future of Lynchs' pre-McCook businesses.

179). The Plaintiff / Relator hereby declares that the Trustee, David P. Leibowitz, is acting in bad faith in his official capacity for serious misconduct that meets the bad faith prosecution exception of ***Younger v. Harris*, 401 US, 37, 91 S. Ct. 746, 27 L.Ed. 2d. 699 (1991**) and justifies federal intervention in the pending proceedings pursuant to 28 USC § 586 (a)(3)(F). ***In***

*the Matter of: Lewis C. Leonard Debtor. Appeal of: Robert Barker and Theodore Lieblich* **No. 96-3970, (7th Cir)**

180). The Defendants have illegally fabricated court documents to defraud the Court in their desperate attempt to convict and destroy the Lynchs as a part of their hostile take-over of McCook Metals, LLC, and already named properties.

181). The Defendants have conspired to commit, cover up, and continue committing crimes against the Plaintiff / Relator and Lynchs in their efforts to monopolize their interested conspirators business ventures in violation of The Williams Act.

182). The Defendants have conspired to commit, cover up and continue harassing the Plaintiff / Relator and Lynchs in their efforts to 'chill' their Constitutionally Protected Right to present evidence in a Court of Law.

183). The Defendants, most of which are practicing attorneys, have disgraced the legal community with their actions to manipulate that which they are sworn to uphold just to grant favor and reward to those that would support them in their efforts.

184). The Plaintiff / Relator alleges that defendants willfully promote hate crimes by means of:

    a). acts of extortion

    b). invasion of privacy

    c). involuntary servitude

    d). defamation of character

    e). intimidation of a witness

    f). threats to the safety of life, limb, and property

    g). failure to provide equal application of law in court actions.

44

185). The Plaintiff / Relator alleges that defendants willfully violate the victims constitutionally protected rights as provided by 42 U.S.C. §§ 1982, 1983, and 1985 (3)), as the state and their agents Willfully causing harm to the US Judicial process.

186). Plaintiff / Relator had filed Action 06-2500 in the US District Court for the Northern District of Illinois, Eastern Division, on May 4th, 2006, in efforts to address the fraud and abuses by the parties within the courts, only to have it dismiss and sealed conveniently the same day that Michael, Kimberlee and Kevin were amended in as plaintiffs, May 10th, 2006, 'purportedly' by the Chief Judge, Charles P. Korocas, and Deputy Clerk, Stephen C. Tokoph, neither of which were assigned to the matter as of the record, though both are in violation of abuse of seal, and in direct violation of equal access to the courts as a matter of right.

187). The Defendants have now, moved in and violated a contract of sale of property owned by Michael and Kimberlee Lynch, granting the purchaser a $40,000.00 discount on the same property in the Defendants efforts to extort the Lynchs for more money.

188). While Defendants [specifically Richard Hirsch and Eugene Wedoff] admitted in the Bankruptcy court that they were named Defendants of the 'dismissed' action filed by Mr. Price, and the Lynchs by amendment, they had no remorse, nor concern, in proceeding and successfully converted the Chapter 11 Bankruptcy into a Chapter 7 liquidation as of May 18, 2006, to displace the Lynch family from their home while watching the proceeds from the Chapter 11 draw interest in the bank for their rewards of completion of tasks by ALCOA, JP Morgan, and GECC. Whereby, violating yet another seal in the Dirksen Building, now by the US District Court for the Northern Division of Illinois, Eastern Division, and Bankruptcy Court for the same.

189). As described in *In re: ABC Utilities Services, Inc., et al.*, **Case No. 89-41420-BJH-7**, related Opinions from similar matters include, but are not limited to: Baldi v. Longview, No.

02 C 4608 (N.D.Ill. 10/06/2003) 05-2539; No: 02 CH 09478; 04 L 13656; 02 CH 6429, 98 CH

11007, 05 B 32440, 05 A 2594, and 05A2612 in Cook County District Court, 04 B 24507, in the

US District Court / Bankruptcy Court for the District of Northern Illinois, and 02 C 399  in the

Seventh Circuit Court of Appeals against Michael, Kimberlee, and Kevin Lynch. All of which

are inclusive of the Scottsboro, Longview, Great Lakes, and now, McCook litigations. The

Defendants are on an active movement to cover their own interest and personal profits of the

continued litigations and proceed to destroy the Lynchs in the process.

190). Trustee Baldi has refused to turn over the completed financial records of the McCook

action, disclosed in an earlier hearing as the $38 million bribery fund.

191). Jim Breem [KPMG] has equally failed to turn over the completed tax records

repeatedly requested by Michael.

192). Michael Lynch is introducing the records of the 'Scottsboro' matter as evidence of

the tax fraud committed in that matter to affirm that the actions of Baldi and Breem are nothing

more than a continuation of the same in this matter.

193). The forced sale of the condominium belonging to the Lynchs is further proof of the

fraudulent actions of the fraud being committed in this court against Michael, and the same

Cease and Desist is sought for the 'fire sale' of said property.

194). An extension of time was requested by Michael Lynch and circumvented by the

opposing parties and the court to allow for the completion of the debt reorganization plan in the

deliberate efforts of all combined to destroy the Lynchs for their own financial gain. ***In re: ABC***

***Utilities Services, Inc., et al.*, Case No. 89-41420-BJH-7(5th Cir.)(2003)**

195). The Defendants present themselves as the applicators and presenters of law in the

state and federal courts in Illinois. Each contends that they have successfully completed the

necessary training and certifications to partake as an active lawyer or presiding judge within the courts. None have publicly presented, or have made available for view, their certificate of oath, required by law to be in their possession prior to practicing the field of lawyer and presiding judge.

196). The Defendants have individually and / or collectively breached their contract with the state of Illinois and the United States of America by abusing their respective positions and affiliations by through their respective occupational titles to monopolize the Bankruptcy Court proceedings and deny the debtor any form of protection under the Constitution of the United States and individual state, in this instance Illinois.

197). Defendants have now disclosed the proof of the undispersed assets of McCook Metals as they were being sought to pay for the legal fees of defendants 'Baldi' and 'Shaw Gussis' by and through motion of the US Bankruptcy Court in the Northern District of Illinois, Eastern Division, and granted for such. Only confirming that the assets purportedly liquidated and dispersed are in factuality sitting in an account awaiting the finalization of the eminent financial destruction of the Lynchs and David Martin Price to be divided among the defendants.

198). The Plaintiff / Relator is aware that under the provisions of Multiple Filings – The length of time after a Ch 7 case that you must wait before filing another Ch 7 case has been increased to 8 years.

199). You may not receive a discharge in a Ch 13 case for 4 years if you received a discharge in a case filed under chapters 7, 11, or 12 during the past 4-years, or for 2 years if you received a discharge in a case filed under chapter 13 during the past 2-years. This does not mean that you cannot file a Chapter 13 case, but it does affect what you can accomplish in a second

case. Therefore, bringing cause for Joseph Baldi to be included in this action for his request to directly violate the rules governing bankruptcy to even ask for that in the contents of his motion.

200). The Plaintiff / Intervenor had contracted a Federal Auditor who discovered fraud, extortion, ex parte communications (written and oral), tax fraud, embezzlement, conspiracy to commit fraud, conspiracy to conceal fraud, obstruction of justice, the knowledge of and failure to act, the failure to report illegal activity as a court certified officer, and the violation of constitutional rights, violation of breech of oath, ethics violations, judicial ethics violations, violations of judicial cannons, violations of fiduciary duty, concealment of records, etc.

## APPLICATION FOR WRIT OF *QUO WARRANTO*

Accordingly, in deference to applicable Illinois Federal and State laws, the United States hereby moves this honorable Court for a lawful Writ in the nature of *Quo Warranto*, properly issued by the Circuit Clerk upon, The Honorable Mark Filip, The Honorable Joel M. Flaum, The Honorable Eugene R. Wedoff, The Honorable James B. Zagel, The Honorable Charles P. Korocas, Ira Bodenstein, as U.S. Trustee, Joseph Baldi, as U.S. Trustee, David P. Leibowitz, as U.S. Trustee,, to demonstrate by what lawful authorities (if any) each claims to preside on the 7th Circuit District Court of the United States for the Eastern Judicial District of Illinois, and by what lawful authorities (if any) each claims to exercise the judicial Power of the United States under Article III in the instant case.

## REMEDY REQUESTED

The *Plaintiff / Intervenor* requests the remedy to the above captioned Court for an Order suspending, removing, or impeaching, the Defendants, The Honorable Mark Filip, The Honorable Joel M. Flaum, The Honorable Eugene R. Wedoff, The Honorable James B. Zagel,

The Honorable Charles P. Korocas, Ira Bodenstein, as U.S. Trustee, Joseph Baldi, as U.S. Trustee, David P. Leibowitz, as U.S. Trustee, from performing any of the official duties as Judge in the 7th Circuit District Court of the District of Illinois Eastern Division, pending a final Hearing and determination on the Petition for Declaratory Judgment, and judgment of Quo Warranto Suspending, removing, ousting, or Impeaching the Defendants, The Honorable Mark Filip, The Honorable Joel M. Flaum, The Honorable Eugene R. Wedoff, The Honorable James B. Zagel, The Honorable Charles P. Korocas, Ira Bodenstein, as U.S. Trustee, Joseph Baldi, as U.S. Trustee, David P. Leibowitz, as U.S. Trustee, from the Office as Judge in the 7th Circuit District Court of the District of Illinois Eastern Division, and directing that the authority having power of appointment to fill the vacancy of Judge in the 7th Circuit District Court of the District of Illinois Eastern Division, upon such suspension, to appoint a proper person temporarily to fill the Office of Judge in the 7th Circuit District Court of the District of Illinois Eastern Division, and to carry on their duties, until such matters shall be determined, or until the successor to the Office of Judge in the 7th Circuit District Court of the District of Illinois Eastern Division, is elected and duly qualified.

**THEREFORE,** Mr. David Martin Price, President of Independent Federal Fund Oversight Committee, 3121 SE Fremont St., Topeka, Kansas 66605, (785) 267-5132, is filing the Complaint pursuant to Pursuant to Motion as intervention of right and application for Writ in the nature of Quo Warranto 3:2:1 (in judicial mode); 28 U.S.C. §§ 2072(b), 2403(a); FRAP Rule 44; and, FRCP 24(a), (c) *in pari material*, to the above captioned Court for an Order suspending, removing, or impeaching, the Defendants, The Honorable Mark Filip, The Honorable Joel M. Flaum, The Honorable Eugene R. Wedoff, The Honorable James B. Zagel, The Honorable

Charles P. Korocas, Ira Bodenstein, as U.S. Trustee, Joseph Baldi, as U.S. Trustee, David P. Leibowitz, as U.S. Trustee, from performing any of the official duties as Judge in the 7th Circuit Court of the District of Illinois Eastern Division , pending a final Hearing and determination on the Petition for Declaratory Judgment, and judgment of Quo Warranto Suspending, removing, ousting, or Impeaching the Defendants,  The Honorable Mark Filip, The Honorable Joel M. Flaum, The Honorable Eugene R. Wedoff, The Honorable James B. Zagel, The Honorable Charles P. Korocas, Ira Bodenstein, as U.S. Trustee, Joseph Baldi, as U.S. Trustee, David P. Leibowitz, as U.S. Trustee, from the Office as Judge in the 7th Circuit District Court of the District of Illinois Eastern Division, and directing that the authority having power of appointment to fill the vacancy of Judge in the 7th Circuit District Court of the District of Illinois Eastern Division, upon such suspension, to appoint a proper person temporarily to fill the Office of Judge in the 7th Circuit District Court of the District of Illinois Eastern Division,  and to carry on its duties, until such matters shall be determined, or until the successor to the Office of Judge in the 7th Circuit District Court of the District of Illinois Eastern Division, is elected and duly qualified

Respectfully submitted,

David Martin Price
President of **I.F.F.O.C.**
(Independent Federal Fund Oversight Committee)
3121 SE Fremont St.
Topeka, Kansas 66605
(785) 267-5132
**iffocpresident@cox.net**

## CERTIFICATE OF SERVICE
### [ K.S.A. 60-205 ]


The undersigned hereby certifies that a true and correct copy of the foregoing document in the above-captioned matter was deposited in the United States mail, first-class postage prepaid, addressed to:

Paul D. Clement
Office of the Solicitor General
950 Pennsylvania Ave., NW
Washington, D.C.   20530-0001

Mr. Alberto Gonzales - U. S. AG, DOJ
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

U.S. House of Representatives
Washington, DC 20515
(202) 224-3121


Office of Senator (Name)
United States Senate
Washington, D.C. 20510

**U.S. Supreme Court**
U.S. Supreme Court Bldg.
Washington, DC 20543



on the_____ day of July, 2006.


Respectfully submitted,

David Martin Price
President of **I.F.F.O.C.**
(Independent Federal Fund Oversight Committee)
3121 SE Fremont St.
Topeka, Kansas 66605
(785) 267-5132
**iffocpresident@cox.net**